RECEIVED
USDC. CLERK. CHARLESTON. SC

2010 JUL -1 P 3: 07

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

THEODRIC DANIELS,           )     C.A. No. 2:09-0031-MBS-RSC
                            )
            Plaintiff,      )
                            )
        -versus-            )     **REPORT AND RECOMMENDATION**
                            )
BERKELEY COUNTY SCHOOLS,    )
                            )
            Defendant.      )

This employment discrimination case alleging retaliation for
engaging in protected activity in violation of Title VII of the
Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq., is before
the undersigned United States Magistrate Judge for a report and
recommendation on the defendant's motion for summary judgment
filed on November 24, 2009. 28 U.S.C. § 636(b).

This action brought by Theodoric Daniels against his former
employer Berkeley County Schools (BCS), was removed from the
Court of Common Pleas for Berkeley County on January 6, 2009.
Discovery is complete.  Daniels opposed BCS's motion on January
4, 2010, and BCS filed a reply on January 14, 2010.  Oral
arguments were had before the undersigned on January 28, 2010.

### SUMMARY JUDGMENT STANDARD

To grant a motion for summary judgment, this court first
must find that "there is no genuine issue as to any material
fact." Fed.R.Civ.P. 56(c).  The judge is not to weigh the

1

evidence, but rather to determine if there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party bears the burden of proof at trial. Celotex Corp. v. Cattrett, 477 U.S. 317 (1986). All evidence should be viewed in the light most favorable to the non-moving party. Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-23 (4th Cir. 1990). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." Teamsters Joint Council No. 83 v. CenTra, Inc., 947 F.2d 115, 119 (4th Cir. 1991); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

Speculation is not enough to withstand a motion for summary judgment. Ash v. United Parcel Service, Inc., 800 F.2d 409, 411-12 (4th Cir. 1986). Indeed, the court should draw reasonable inferences on behalf of the non-moving party, but it must not slip into "sheer speculation." The court may not move beyond inference and into the realm of mere conjecture. Lovelace v.

<u>Sherwin-Williams Co.</u>, 681 F.2d 230, 242 (4th Cir. 1982). Such bald, unsupported, and conclusory allegations do not constitute evidence and therefore do not create triable issues of fact. <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1128 (4th Cir. 1987). A plaintiff's beliefs, just like conclusory allegations, speculation, and conjecture are simply insufficient to defeat a properly supported motion for summary judgment. <u>See</u>, <u>Ross v. Communications Satellite Corp.</u>, 759 F.2d 355,364 (4th Cir. 1995).

In summary, the plaintiff must present admissible evidence which raises a material and genuine factual dispute. "The mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." <u>Anderson</u>, 477 U.S. at 252.

## <u>LAW OF RETALIATION UNDER TITLE VII</u>

Title VII states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... to discriminate against any individual ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

A plaintiff may demonstrate retaliation through direct or circumstantial evidence. <u>See</u>, <u>Price v. Thompson</u>, 380 F.3d 209,

3

212 (4th Cir. 2004). When there is insufficient direct evidence to prove a claim, a plaintiff may proceed under the *McDonnell Douglas* framework. Id. Under the *McDonnell Douglas* framework, the plaintiff has the initial burden of demonstrating a prima facie case of retaliation by a preponderance of the evidence. See, Bryant v. Bell Atl. Md. Inc., 288 F.3d 124, 133 (4th Cir. 2002). If the plaintiff satisfies the initial burden of demonstrating a prima facie case, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for its adverse employment action. See, Beall v. Abbott Lab., 130 F.3d 614, 619 (4th Cir. 1997). If the employer satisfies its burden of production, then the burden of proof shifts back to the plaintiff to show that the employer acted with a retaliatory intent and that its proffered explanation was a pretext for retaliation. See, Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007). The court notes that:

> [A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.... [J]udgment as a matter of law may be appropriate if a plaintiff created only a weak issue of fact as to whether the employer's reasons were untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

Id. at 215 (internal citations and quotation marks omitted).

To establish a *prima facie* case of retaliation, Plaintiff must prove that: 1) he engaged in a protected act, 2) an adverse

4

employment action was taken against him, and 3) there is a causal connection between the act and the adverse action. See, Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004). Protected activity includes "opposing an unlawful employment practice or participating in any manner in a Title VII investigation, proceeding, or hearing." Reed v. Airtran Airways, Inc., 351 Fed. Appx. 809(4th Cir. 2009).

As to the second factor, adverse employment actions need not be so severe as to "affect the terms and conditions of employment." Burlington N. & Santa Fe Rwy. v. White, 548 U.S. 53, 64, 126 S.Ct. 2405 (2006). Adverse employment actions, however, must be "materially adverse," meaning adverse actions must be such that they could dissuade "a reasonable worker from making or supporting a charge of discrimination." Id. at 68.

### FACTS

The undisputed facts and the facts according to the plaintiff as the party opposing the motion, and all reasonable inferences therefrom to the extent supported by the record are as follows.

The plaintiff, Theodric "Derrick" Daniels, was employed by Defendant Berkeley County School District from 1987 until he resigned effective June 30, 2008. He began serving in an assistant principal capacity at the middle and high school levels in 1998. In December 2003, he was reassigned to serve as the

5

interim principal of St. Stephen Middle School (SSMS) on the recommendation of the Superintendent, Dr. J. Chester Floyd[1]. (Floyd Aff. ¶ 2; Daniels Dep. Exh. 1). Thereafter he went through a formal interview process and was told he had the job as principal and that a contract would follow.

Daniels' protected activities that form the basis of his retaliation claim took place on June 14, 2004, when he was in the interim principal capacity. (Floyd Aff. ¶ 2). That day he and several other African-American administrators employed by the School District and collectively named the Berkeley County Alliance of Black School Educators met with Floyd to discuss their concerns with the hiring of minority teachers and administrators, the assistance offered to schools identified as "failing" under the No Child Left Behind Act, narrowing the achievement gap among black, white, and Hispanic students, maintenance at rural schools, and reducing anxiety and stress with the reassignments of administrators. (Defendant's Exhibit BB; Floyd Aff. ¶ 5).

During the June 14, 2004, meeting, Daniels alleged that maintenance work orders for rural schools whose students are primarily African American had been "shifted from the top to the bottom" as far as prioritizing maintenance needs. (Daniels Dep.

---

[1] Floyd was Superintendent from July 1997 to January 2009.

6

pp. 126-127). According to Daniels, he had received this information from a maintenance worker named "Big Lenny," and some other maintenance department employees. (Daniels Dep. pp. 138-144). Daniels deposed that after he made the comment, Floyd "raised his voice," was "visibly upset," by the allegation and expressed surprise. (Daniels Dep. pp. 151-158).

Daniels deposed that as he was walking to his vehicle after he left the meeting he had a conversation with Charlie Davis, who was then a District office administrator for the school District, and Willis Sanders, the Chief Human Resources Officer. (Daniels Dep. pp. 158-162). Based on the advice of Davis and Sanders, Daniels requested a meeting and met with Floyd. Daniels had what he describes as "very healthy conversation" and "good exchange" with Floyd, and Daniels testified that after the meeting he felt like Floyd "knew where I was coming from and that I was still in his good graces." (Daniels Dep. pp. 163-166). Floyd likewise described the meeting as sincere and productive. (Floyd Aff. ¶ 7). Daniels further testified that he believed the group had attacked Floyd unfairly for some things. (Daniels Dep. p. 166).

In the meantime, Floyd had asked Ken Coffey, who was then the District's Assistant Superintendent for Operations and Facilities, to look into allegations that the rural schools' work orders had been skipped over or delayed in favor of other schools. (Coffey Aff. ¶ 3). Coffey spoke with the District's

7

Director of Maintenance and found that the allegations were not true and reported that to Floyd. (Coffey Aff. ¶ 4; Floyd Aff. ¶ 6).

Almost immediately following Floyd's follow-up meeting with Daniels, Floyd received a letter dated June 29, 2004, that was signed by the members of the Berkeley County Alliance of Black School Educators including Daniels. (Floyd Aff. ¶ 8; Defendant's Exhibit BB). The tone of the letter was contrary to Floyd's conversation with Daniels. (Floyd Aff. ¶ 8; Def. Ex. BB). Daniels testified that "by me signing, it didn't say that I agree to everything that was discussed in the letter. It's just that this was a follow-up from the meeting that was held on that date." (Daniels Dep. p. 173).

After receiving the letter, Floyd had another meeting with Daniels, during which Daniels explained that he had signed the letter prior to his earlier meeting with Floyd and one of the members of the group had changed the date. (Floyd Aff. ¶¶ 8-9, Daniels Dep. pp. 166-179). He assured Floyd that he did not go out and sign the letter after his prior positive meeting with Floyd. (Daniels Dep. pp. 173-175). Floyd commented during the meeting, "Derrick, he says I may be here for one or two years, but you got a long way to go and being part of this group, you're making yourself unemployable and those were the words he says to me." (Daniels Dep. p. 168). Floyd's testimony is that he was at

no time angry with Daniels during the course of the meetings in June 2004. (Floyd Aff. ¶ 9).

As noted, following Daniels' meetings with Floyd, Daniels officially became the principal of SSMS, effective July 1, 2004. (Floyd Aff. ¶ 11). Floyd also recommended that Daniels return as the SSMS Principal for the 2005-06 school year and Daniels was issued a contract. (Def. Ex. V).

Thereafter, Daniels was accused of sexual harassment by a teacher and Willis Sanders, then the Assistant Superintendent for Personnel Services and Terri Myers, then the District's Director of Personnel, met with Daniels. Sanders followed up with a letter of caution to Daniels on July 22, 2005, reminding Daniels of the importance of behaving professionally at all times and reminding him of the School District's sexual harassment policies. (Sanders Aff. ¶ 6; Def. Ex. J).

Next, in accordance with School District policy, state law, and regulations of the South Carolina Department of Education, the School District was required to evaluate Daniels' performance for the 2005-06 school year since he had completed his induction year. (Daniels Dep. pp. 51-52; Def. Ex. E, F, G, I; Hammett Aff. ¶¶ 3-4). Judy Hammett, who had been the School District's Executive Director of Leadership Development and Evaluation for 20 years, served as the School District's coordinator for the Program for Assisting, Developing, and

Evaluating Principal Performance ("PADEPP"). In that capacity, she was responsible for assigning evaluation teams for principals undergoing evaluation. (Hammett Aff. ¶ 1). Floyd had no input in the composition of the evaluation teams Hammett assigned. (Hammett Aff. ¶ 5; Floyd Aff. ¶ 14). Willis Sanders, the Chief Human Resources Officer, and Dr. Wanda Whatley, the School District's former Assistant Superintendent for Instruction, were assigned as Daniels' evaluators for the 2005-06 year. (Whatley Aff ¶ 2; Sanders Aff. ¶ 7).

Sanders and Whatley rated Daniels as unsatisfactory in their evaluation completed on June 28, 2006. The criteria for the evaluation mirrored Regulation 43-165.1 of the South Carolina Department of Education. (Def. Ex. I, T; Daniels Dep. pp. 56-59). Daniels received "Improvement Needed" ratings in Effective Management and Climate with an overall rating of "Improvement Needed." (Whatley Aff. ¶¶ 2-3; Sanders Aff. ¶ 7; Def. Ex. T). Regarding the Effective Management criterion, Sanders and Whatley noted, "Personnel polices and procedures are not followed consistently. Safety and security procedures were generally followed. The consistent cleanliness of the building is a concern that needs to be addressed. Insufficient evidence was provided or observed to indicate that standard was being met on a consistent basis."

Daniels signed off on the evaluation. He had the opportunity to challenge the findings, but he did not submit any written response. (Def. Ex. K, T; S.C Code Regs. 43-165.1 (V), (D); Daniels Dep. pp. 188-189; Hammett Aff. ¶ 6).

Daniels received a contract to return as principal of SSMS for the 2006-07 school year. (Daniels Dep. p. 60; Def. Ex. V). As a result of his "Improvement Needed" rating on his performance evaluation for the 2005-06 school year, the School District was required under School District policy and state law to formally evaluate Daniels' performance again during the 2006-07 school year. (S.C. Code Regs. § 43-165.1 (I)) ("Any principal whose performance on the evaluation is determined to be unsatisfactory must be formally evaluated the following year."). (Franchini Aff. ¶ 2; Floyd Aff. ¶ 17; Daniels Dep. pp. 54-59, 189).

At the beginning of the 2006-07 school year, Daniels was provided an improvement plan to help him address the shortcomings noted in the evaluation for 2005-06. (Franchini Aff. ¶ 2; Whatley Aff. ¶ 2; Def. Ex. L). The "Principal's Professional Development Plan" provided strategies and action steps, goals, and timelines to help improve his evaluation for the 2006-07 school year. (Def. Ex. U). Sanders was assigned as Daniels' mentor and provided him assistance. (Sanders Aff. ¶ 8; Def. Ex. S). Additionally, Daniels was assigned a school-level mentor, Janie Langley. (Def. Ex. M).

Consistent with the procedure for the 2005-06 evaluation year, Hammett assigned Archie Franchini, who was then the Secondary Schools Supervisor as well as Daniels' direct supervisor, to Daniels' evaluation team for the 2006-07 school year. (Hammett Aff. ¶ 5; Franchini Aff. ¶ 2). Ken Coffey, then the District's Assistant Superintendent for Operations and Facilities, served as the second evaluator on Daniels' 2006-07 evaluation team. (Coffey Aff. ¶ 2). As before, Floyd had no input in the selection of the evaluation team. (Floyd Aff. ¶ 14).

Throughout the 2006-07 school year, Sanders met with Daniels to assist him in getting ready for the school year, dealing with employee conflicts, improving upon parent and employee survey results for the school, and the prior suggestions for success on the PADEPP. (Sanders Aff. ¶ 8; Defendant's Exhibits S, W). Franchini gave Daniels feedback on his performance during the evaluation term, specifically noting concerns with Daniels leaving the campus without an administrator on duty without prior notice to Franchini. (Franchini Aff. ¶ 3; Def. Ex. M, N). Daniels was also provided specific feedback regarding what Franchini and Coffey perceived as deficiencies in his performance under the PADEPP criteria on January 30, 2007. (Def. Ex. U -PADEPP Documentation and Feedback Form).

On his final evaluation for the 2006-07 school year, Daniels again received an overall "Improvement Needed" rating and

received "Improvement Needed" on four of the nine evaluation criteria. (Def. Ex. O, U). The four criteria were Standard 1: Vision; Standard 2: Instructional Leadership; Standard 5: School/Community Relations; and Standard 8: Staff Development. (Def. Ex. U).

On April 11, 2007, Franchini and Coffey met with Daniels to give him their evaluation. Daniels again signed off on the evaluation and did not submit any type of written response challenging the findings. (Hammett Aff. ¶ 6; Daniels Dep. pp. 53-54).

Next, as part of the Education Accountability Act of 1998, S.C. Code Ann. §§ 59-18-1500-1595 requires that an External Review Team ("ERT") from the Intervention and Assistance Program, Office of School Quality, Division of Curriculum Services and Assessment conduct an on-site visit and evaluation of schools that receive "Unsatisfactory" report card ratings, like SSMS. (Def. Ex. H; Hickman Aff. ¶¶ 2-4). SSMS received an absolute rating of "Below Average" and an improvement rating of "Unsatisfactory" in 2005 and did not make Adequate Yearly Progress ("AYP"). (Def. Ex. Z). In 2006, SSMS received an "Unsatisfactory" absolute rating and an "Unsatisfactory" improvement rating. (Def. Ex. AA).

Pursuant to S.C. Code Ann § 59-18-1510, an ERT was appointed to conduct an on-site visit and evaluation of SSMS. (Hickman Aff.

13

¶ 4). The members of the ERT were Paul Hickman, the chair, a long-term administrator employed with Horry County Schools; Darlene Prevatt and Jacqueline Jamison. The School District had no input in the composition of the ERT, prior consultation with the ERT, or communications prior to the ERT's site visit. (Hickman Aff. ¶ 6).

In its 98 page report, the ERT identified numerous concerns and offered numerous recommendations and offers of technical assistance. (Hickman Aff. ¶ 5). In the area of Leadership and Governance, the ERT report concluded that 14 of the performance indicators were unfulfilled. (Hickman Aff. ¶¶ 5-6; Def. Ex. Y). In the area of curriculum and instruction, the ERT concluded that 9 of the performance indicators were unfulfilled; in the area of Professional Development, the ERT concluded that 7 of the performance indicators were not fulfilled. The ERT made a significant number of recommendations to the school. Although a process was available by which Daniels could have refuted the findings of the ERT, he did not raise any objections or concerns with the ERT's findings. (Hickman Aff. ¶ 6; Daniels Dep. pp. 99-100). Daniels conceded that the ERT team members were fair and professional, and the report was accurate. (Daniels Dep. pp. 83-94).

Daniels' evaluation team for the 2006-07 school year took the ERT's findings into account in the evaluation of Daniels and

14

the decision to recommend that his assignment as principal at
SSMS not be renewed for the 2007-08 school year. (Franchini Aff.
¶ 8; Def. Ex. O). Floyd accepted the recommendation of Franchini
and Coffey and reassigned Daniels to an administrative position
at Goose Creek High School for the 2007-08 school year with no
reduction in his salary. Based on two years of "Improvement
Needed" evaluations and the concerns noted by the ERT, Floyd
concluded, "These concerns suggest a lack of appropriate
leadership and guidance from you as principal. You have been
provided with ongoing assistance and yet you still did not
achieve successful evaluations." (Def. Ex. P). Floyd told
Daniels of his decision during a conference on April 12, 2007,
and followed it up in writing. (Floyd Aff. ¶ 21; Def. Ex. P).

In April 2007, after the Reassignment Notification for
2007-08 School Year was given to Daniels, Margaret Tabor, the
same Teacher Evaluator to whom Daniels' allegedly inappropriate
comments in 2005 were reported, received another complaint from a
different teacher that Daniels had been making inappropriate
comments about her appearance. (Tabor Aff. ¶ 5). Tabor found the
teacher's allegations credible and reported them to Sanders.
(Tabor Aff. ¶ 6). The teacher provided a written summary of the
comments Daniels made to her, including allegations that Daniels
had told her "you make me crazy," "you look very good today," and
that he wanted to take her to a conference. (Sanders Aff. ¶ 10).

The teacher also alleged that when Daniels walked her to her car after observing part of a Reproductive Health Education class she had been teaching, he told her that he had to leave early because she was "exciting" him, and that he would like to see under her blouse because she was looking "perky." (Sanders Aff. ¶ 10; Def. Ex. Q).

Sanders and Franchini met with Daniels on April 30, 2007, to tell him about the teacher's allegations and to give him a chance to respond. Daniels generally denied the allegations, and said that the teacher was flirting with him and making advances toward him. (Daniels Dep. pp. 215-225). He did say that he had a conversation with her during which he said something to the effect of "Don't get me wrong - I've never cheated on my wife and I don't plan on cheating." (Def. Ex. R; Daniels Dep. pp. 224-225). Daniels deposed that he told the teacher on occasions, "you look very good today" and "you're looking very perky today." (Daniels Dep. pp. 226-227). Daniels told Franchini and Sanders that he was not going to respond further and left the conference. (Daniels Dep. pp. 229-232). Daniels was placed on administrative leave with pay until an investigation could be completed since he declined to participate.

When the investigation was over Floyd decided that it was in the best interests of the school not to return Daniels to SSMS

16

for the balance of the 2006-07 school year. Floyd wrote a letter
to Daniel's and presented his rationale as follows:

> In light of the July 2005 letter [addressing
> inappropriate comments to a female teacher] and
> discussion with you, you should have made your
> supervisor aware that a teacher was flirting with
> you and making advances toward you so her conduct
> could have been addressed. Similarly, we do not
> understand the circumstances that would have led
> you to talk with the teacher about whether you
> have cheated on your wife. I am also concerned
> that you did not complete the conference and
> provide a full response to the allegations made
> against you.

(Def. Ex. R).

Effective June 8, 2007, Daniels was assigned as an
administrative assistant with teaching responsibilities at Goose
Creek High School for the 2007-08 school year at the same salary
he received for the 2006-07 school year. Daniels served in that
position until he resigned effective June 30, 2008. Through the
last day he worked with the School District, Daniels' pay was
never decreased. (Daniels Dep. pp. 258-259). Daniels accepted a
position with the Charleston County School District as an
assistant principal in August 2008 and is currently serving in
that position. (Daniels Dep. pp. 24, 32-38). During his entire
employment with the defendant, Daniels did not file a grievance
of any kind.

## DISCUSSION

A review of the record and relevant case law reveals that
the defendant's motion for summary judgment should be granted and

17

this matter ended.

First, Daniels has failed to establish a *prima facie* case of retaliation because he cannot bear his burden to show a causal link between his protected activity of June 2004 and the adverse action in June 2007, Daniel's reassignment from his job as the principal of SSMS to an administrative assistant with teaching responsibilities at Goose Creek High School. To the contrary this lapse of about three years negates a causal connection between those events.

The Fourth Circuit has held that a causal connection, for purposes of demonstrating a *prima facie* case, exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity. Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989). Generally, however, the passage of time tends to negate this inference. See, Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74, 121 S.Ct. 1508 (2001) (per curiam) (citing cases); Dowe v. Total Action Against Poverty, 145 F.3d 653, 657 (4th Cir. 1998).

Here, Daniels fails to establish a causal connection based on temporal proximity alone, as the protected activity, Berkeley County Alliance of Black School Educators of which he was a member met with Floyd to discuss their concerns about the maintenance delays in the mainly minority rural schools on June 14, 2004, occurred approximately three years prior to his

reassignment on June 8, 2007. See, e.g., Pascual v. Lowe's Home
Centers, Inc., 193 Fed. Appx. 229, 232 (4th Cir. 2006)
(unpublished) (holding that three to four months between the
termination and protected activities is too long to establish a
causal connection by temporal proximity alone); Garrett v. Lujan,
799 F.Supp. 198, 202 (D.D.C. 1992) (concluding that the passage
of nearly a year precluded an inference of causal connection);
Parrott v. Cheney, 748 F.Supp. 312 (D.Md. 1989) (even the passage
of as little as five months between filing EEOC complaint and
adverse action may be enough to negate causal connection in a
particular factual context), aff'd per curiam, 914 F.2d 248 (4th
Cir. 1990).

Additionally, following his protected activity, it is
undisputed that Daniels became the principal of SSMS. Floyd
reappointed him as principal for two more full school years,
although Daniels, through his performance and his conduct,
frequently provided the School District's administration reasons
and opportunities to reassign him from the position. Under S.C.
Code Ann. § 59-24-15, Daniels had no right to an administrative
position and could have been reassigned at any time. A
reasonable fact finder could not find that the alleged
retaliator, Floyd, would continue to reassign Daniels to the same
position for two additional school years if he sought to
retaliate against him. Daniels also cannot offer any evidence

19

that Floyd had any involvement or input in selecting Daniels'
evaluators or had any input in either the in-house evaluations
conducted by other School District administrators or the
independent evaluation conducted by the ERT.

Similarly, Daniels has not offered any evidence that Floyd
or any other administrator caused a female teacher to report
concerns over Daniels' conduct towards her.

On this record it appears that the defendant is entitled to
summary judgment because the plaintiff has not forecast evidence
sufficient to state a *prima facie* case of retaliation as a matter
of law.

Even if Daniels had established a *prima facie* case of
retaliation, he cannot rebut the school district's legitimate
nondiscriminatory reasons for his reassignment: poor performance
as reflected by negative evaluations and complaints.  Daniels
has no evidence that any decision maker did not truly believe
Plaintiff's performance was deficient in the areas stated in his
evaluations, which is the relevant inquiry. See, Holland v.
Washington Homes, Inc., 487 F.3d 208, 217 (4th Cir. 2007).  He
offers only his self-assessment of his own performance, which is
not enough to create a genuine issue of material fact.

This is simply a case, "where the record taken as a whole
could not lead a rational trier of fact to find for the non-
moving party" making disposition by summary judgment appropriate.

Teamsters Joint Council No. 83 v. CenTra, Inc., 947 F.2d 115, 119 (4th Cir. 1991).

## CONCLUSION

Accordingly, for the aforementioned reasons, it is recommended that the defendant's motion for summary judgment be granted.

Respectfully Submitted,

Robert S. Carr
United States Magistrate Judge

Charleston, South Carolina

July 1, 2010